Argued and submitted June 16, reversed and remanded in part; otherwise affirmed
February 17, 1999

Glen D. MARK
and Teri L. Powers,
*Appellants,*

*v.*

STATE OF OREGON,
STATE DEPARTMENT OF FISH AND WILDLIFE,
and State of Oregon,
Division of State Lands,
*Respondents.*

(962019; CA A97066)

974 P2d 716

Teri L. Powers argued the cause for appellants. With her on the briefs was Glen D. Mark.

John T. Bagg, Assistant Attorney General, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

Edmonds, J., dissenting.

**WARREN, P. J.**

Plaintiffs have lived on Sauvie Island since June 1990. They bought their land, which is surrounded by the Sauvie Island Wildlife Area (wildlife area), in February 1990. The portion of the wildlife area near where they live is a popular location for public nudity to an extent that, plaintiffs assert, constitutes both a private and a public nuisance. Defendant Division of State Lands (State Lands) owns the wildlife area, which it leases to defendant Department of Fish and Wildlife (Fish and Wildlife). In this case, plaintiffs seek compensation for the effects of the nudity on their land and an injunction restraining defendants from allowing public nudity in the wildlife area. They also assert a claim in inverse condemnation on the ground that the effect of the nudity on the value of their land constitutes a taking for which they are entitled to just compensation. On defendants' motions under ORCP 21 A(8), the trial court determined that defendants are immune from liability under the Oregon Tort Claims Act because they were exercising a discretionary function and that plaintiffs had not stated a claim for inverse condemnation. It therefore dismissed both the original and amended complaints. We reverse on the injunction claims and otherwise affirm.

We begin by considering plaintiffs' first assignment of error, which is based on the following facts that they alleged in their original complaint.[1] Defendants own, manage, and control the wildlife area, with the statutory purpose of developing it to provide wildlife management, wildlife-oriented recreation, and public hunting. The wildlife area contains several miles of undeveloped beaches along the Columbia River that attract public use for nonwildlife related activities. An increasing number of those users engage in open public nudity, which is not wildlife-oriented recreation.

---

[1] Both parties filed exhibits that either supplement or respond to plaintiffs' allegations or raise matters of defense. Because a motion to dismiss under ORCP 21 A(8) is decided solely on the facts pleaded in the complaint, *see Greeninger v. Cromwell*, 127 Or App 435, 439, 873 P2d 377 (1994), we do not consider those exhibits. We note, however, that on appeal defendants rely on them in arguing that plaintiffs should not be entitled to relief because they came to the alleged nuisance. That defense is available on an ORCP 21 A(8) motion only if it appears on the face of the complaint, which it does not in this case.

Defendants estimate the total number of yearly visits for that purpose to be in the thousands. Many of those users "parade naked throughout the year all over the wildlife area, including the roads and bushes, and on, around and in view of plaintiffs' and other's private residences."

The activities of the nude users have created a situation where plaintiffs, other local residents, and visitors to the area are helpless to prevent "continuous and oftentimes daily exposure" to full adult nudity. Plaintiffs and their family, friends, and guests have been forced to witness adult nudity and "repeated acts of depravity, illegality and lewdness" because of their location adjacent to defendants' lands. Plaintiffs, other residents, and other members of the public have reported those facts to defendants and informed them of the harm that results from the public nudity and related activities.

According to plaintiffs, defendants have the authority, obligation, and duty to control the activities of the public in the wildlife area in a way reasonably calculated to prevent harm to the rights and safety of adjacent landowners and the public in general and to the value of surrounding private property. Defendants have knowingly and intentionally failed to exercise that control in a way calculated to prohibit or reasonably restrict public nudity, resulting in harm to plaintiffs and their property.[2] The harm to plaintiffs is that their use of their property and their social life have been restricted by their reluctance to expose themselves, family, friends, and guests to public nudity and open sexual activity, that they are fearful for their safety due to their proximity to the nude beach activities, that they are embarrassed, offended and angered by coming in contact with nude adult behavior, that their right to go for a walk and enjoy the public beaches adjacent to their home has been restricted by harassment from nude sunbathers, and that those things have greatly diminished the value of their property.

In the first and second claims in their original complaint, plaintiff asserted that defendants' actions constituted

_____

[2] Alternatively, plaintiffs allege that defendants did those things negligently or with reckless disregard for the rights and safety of plaintiffs and the public.

both a private (first claim) and a public (second claim) nuisance. They sought damages and an injunction prohibiting defendants from allowing the use of the wildlife area for public nudity. In their third and fourth claims, they alleged that defendants' actions so reduced the value of their property that it constituted a taking for public use, thus entitling them to damages for inverse condemnation under the state (third claim) and federal (fourth claim) constitutions.

The trial court dismissed plaintiffs's original complaint in its entirety for failure to state a claim. In their first assignment of error, plaintiffs argue that the trial court erred by dismissing the first and second (nuisance) claims. In their third assignment of error, which we discuss below, they assert that the trial court erred by dismissing the third and fourth (inverse condemnation) claims.[3] We turn to the first assignment of error.

The trial court dismissed the nuisance claims on the ground that defendants' actions came within the discretionary function exception to a public body's liability in tort. ORS 30.265(3)(c). After the trial court's decision, the Supreme Court held that that provision does not apply to an action for an injunction, because an injunction does not involve potential monetary liability. *Penland v. Redwood Sanitary Sewer Service Dist.*, 327 Or 1, 956 P2d 964 (1998). At least as to the claims for an injunction, thus, the trial court decision was erroneous on the ground on which the trial court relied. However, the state also argued that the facts that plaintiffs alleged do not constitute a public or private nuisance. Because that argument, if correct, would support the trial court's decision dismissing those claims in their entirety, we begin with it.

■■ The doctrines of public nuisance and private nuisance have different origins and protect different interests.

_____

[3] Each "assignment of error" in fact challenges two distinct actions of the trial court—the dismissal of two separate claims for relief. Each assignment, therefore, should more properly be divided into two assignments, one for each claim. *See* ORAP 5.45 and Appendix H; *cf. Hummel v. LCDC*, 152 Or App 404, 412 n 3, 954 P2d 824, *rev den* 327 Or 317 (1998) (petitioner divided a single assignment of error—that the agency improperly approved the urban growth boundary—into several pseudo-assignments based on the different arguments that the agency rejected).

However, many of the governing rules are the same, and we will therefore treat the claims together. A public nuisance is the invasion of a right that is common to all members of the public. Because the primary responsibility for preventing public nuisances is with the public authorities, a private action to enforce that right requires proof that the plaintiff suffered an injury distinct from the injury that the public as a whole suffered. A private nuisance is an unreasonable non-trespassory interference with another's private use and enjoyment of land. The right to recover is in the person whose land is harmed. *See Smejkal v. Empire Lite-Rock, Inc.*, 274 Or 571, 574, 547 P2d 1363 (1976); *Raymond v. Southern Pacific Co.*, 259 Or 629, 634, 488 P2d 460 (1971); *Restatement (Second) of Torts* §§ 821A, 821B, 821D (1979), and introductory note. .

Undesired exposure to sexual activity, such as the presence of a neighboring house of prostitution, is one of the traditional grounds for finding either a public or a private nuisance. *See Prosser and Keeton on the Law of Torts*, 5th ed (W. Page Keeton, ed 1984), § 87 at 620, § 90 at 644; 66 CJS 796, *Nuisances* § 45. In *Blagen v. Smith*, 34 Or 394, 56 P 292 (1899), the plaintiffs owned manufacturing and other businesses near the waterfront just north of Burnside Street in Portland. The defendant built cheap wooden buildings, called "cribs," on a neighboring lot, with the apparent purpose of renting them to prostitutes. The plaintiffs sought an injunction to prevent him from doing so on the ground that that use constituted a public nuisance. The evidence indicated, among other things, that a prostitute inside one of the buildings, "in undress uniform," would negotiate with a group of potential customers who were standing outside. 34 Or at 407.

The Supreme Court noted that other courts held that keeping a house of ill fame was a private nuisance when it rendered the premises of a neighbor "unfit for comfortable or respectable occupation and enjoyment[.]" *Id.* at 405. The plaintiffs, however, sought an injunction on the ground that the "cribs" were a public nuisance, something that the Supreme Court accepted without question. *Id.* at 404. The issue, thus, was whether the plaintiffs were entitled to enjoin that public nuisance. To do so they had to prove that the effect of the nuisance on them was different in kind from that

suffered by the public as a whole. The court held that it was different:

"All property in a city is affected by the maintenance of a bawdy house, just in proportion to its contiguity thereto, and the damage which such property sustains, while differing in degree, does not differ in kind; and, such being the case, the owner of any such property affected in the same general way as other property therein could not successfully invoke equitable relief to enjoin its continuance. *But where, by reason of the proximity of such property to the public nuisance, disgusting scenes and sounds shock the sense of those whose property, or the enjoyment thereof, is affected thereby, the injury sustained is necessarily different in kind from that suffered by the public at large*[.]" *Id.* at 407 (emphasis added).

We have not found any Oregon case that indicates that nudity in itself, with no clear sexual component, constitutes a nuisance. On the one hand, public nudity is not illegal unless it occurs with the intent of arousing the sexual desire of either the actor or another person. *See* ORS 163.465. On the other hand, an activity that is otherwise legal may still constitute a nuisance. *See Lunda v. Matthews*, 46 Or App 701, 706-07, 613 P2d 63 (1980). Otherwise, among other things, there would have been no need to provide that farming and forestry practices conducted on land zoned for farm or forestry use outside an urban growth boundary do not give rise to an action for nuisance. *See* ORS 30.930 through ORS 30.947. The allegations in plaintiffs' original complaint are not limited to mere nudity but would support proof of uncontrolled and intrusive nudity occurring on the area immediately around their property. Whether a particular activity is a nuisance is primarily a factual question that requires applying well-established criteria. *See Penland v. Redwood Sanitary Sewer Service Dist.*, 156 Or App 311, 315, 965 P2d 433 (1998). Although the question is the effect of the challenged activity on an ordinary person, and although the law does not protect the delicate, *see Amphitheaters, Inc. v. Portland Meadows*, 184 Or 336, 349, 198 P2d 847 (1948), plaintiff's allegations would allow finding that the nudity constituted a nuisance.

Plaintiffs also allege that they have been exposed not merely to nudity but also to a variety of sexual activity. A

court could find that the routine use of defendants' land for public sexual activity was a public nuisance. Plaintiffs' allegations would also allow proof that, because of the proximity of their land to the intrusive nudity and the sexual activity, those things have affected their property or their enjoyment of it. If so, plaintiffs' injury would be different in kind from that of the public at large, and they would be entitled to sue to enjoin the public nuisance. The same facts would support a finding that the intrusive nudity and sexual activity impair their use and enjoyment of their land; they would thus constitute a private nuisance for which they could seek damages or an injunction.[4]

That these actions on defendants' land may constitute a nuisance does not, in itself, create a claim against defendants. As state agencies rather than natural persons, defendants are not capable of engaging in public nudity or sexual activity, at Sauvie Island or elsewhere. Plaintiffs do not allege that defendants' employees acting in the course of their employment participated in any of the activity about which they complain. Rather, plaintiffs' complaint is that defendants do not prevent third parties from engaging in public nudity and sexual activity on defendants' lands. That raises the question of whether a court can hold defendants responsible for the acts of third parties when those third parties' actions on defendants' land may constitute a nuisance.

■        The *Restatement* suggests that, in order to be liable for the acts of third parties that create a nuisance on their land, defendants must both (1) know that the activity is being carried on and will involve an unreasonable risk of causing the nuisance and (2) consent to the activity or fail to exercise reasonable care to prevent it. *Restatement (Second) of Torts* § 838 (1979). The few relevant Oregon cases are generally consistent with section 838. In *Fleischner v. Investment Co.*, 25 Or 119, 128, 35 P 174 (1893), the Supreme Court held that

---

[4] This case is distinguishable from *Hay v. Dept. of Transportation*, 301 Or 129, 142-43, 719 P2d 860 (1986), on which defendants rely. In *Hay,* the parking and driving on the beach about which the plaintiffs complained was consistent with the historical use of the beach and was therefore not unreasonable as a matter of law. We cannot say from plaintiffs' complaint that the same is true of the kind of nudity on Sauvie Island that they describe. In addition, in *Hay* the plaintiffs did not allege a special injury to their property, as plaintiffs have done in this case.

a landlord who renews a lease, after the creation of a nuisance on the premises, is chargeable for the continuance of the nuisance. In *Winniford v. MacLeod*, 68 Or 301, 310, 136 P 25 (1913), the court noted in dictum that an owner of real estate who wilfully allows another to create or continue a nuisance on or adjacent to the owner's land, in the prosecution of a business for the owner's benefit, when the owner had full authority to prevent or abate the nuisance, would be liable for injury to another person. The court repeated that dictum in *Dibert v. Giebisch*, 74 Or 64, 70, 144 P 1184 (1914), relying on *Winniford* for support.

■    Plaintiffs allege that defendants have the authority to exercise control over the behavior of the members of the public who congregate in the wildlife area and that defendants, either knowingly and intentionally, or with reckless disregard for the rights and safety of the public, failed to exercise control over nudity in the wildlife area.[5] That is sufficient to allege that defendants are responsible for the actions of the public under the criteria of section 838.

In their original complaint, plaintiffs sufficiently pled a claim for an injunction requiring defendants to take reasonable steps to end either a public or a private nuisance. However, for the reasons that we discuss later in this opinion, we conclude that defendants are immune from liability for any damages that plaintiffs may have suffered.

In plaintiffs' second assignment of error they assert that the trial court erred when it granted defendants' motion to dismiss their amended complaint, which was limited to claims for private and public nuisance. The primary difference between the original complaint and the amended complaint is that, in the amended complaint, plaintiffs focused on a management plan that defendants adopted in 1993 in order to regulate nudity in the wildlife area. Plaintiffs first attack the underlying decision to regulate and control public nudity rather than to attempt to eliminate it. That approach, they allege, conflicts with defendants' mission to permit only wildlife-related activities in the wildlife area. Plaintiffs then

---

[5] Plaintiffs' alternative allegation that defendants acted negligently would not support liability under section 838 because it does not show that they knew or had reason to know of the activity causing the nuisance.

describe the plan as, among other things, distinguishing between "clothing optional" and "clothed" areas, providing for buffer areas between the clothing optional area and private lands, and prohibiting any use of those buffer areas during the warmer months. The plan also contains provisions concerning signs and other matters that were intended to discourage or eliminate public nudity outside of the designated nude beach area.

Plaintiffs next allege that defendants have failed to implement this policy adequately in a number of respects, with the result that

> "hundreds of members of the public traverse nude throughout the Sauvie Island Wildlife Area, including the beaches outside the designated 'clothing optional' beach, the roads, the woods and the lands surrounding plaintiffs' residence."

Plaintiffs and other residents are helpless to prevent "continuous and oftentimes daily exposure" to nudity. They allege that defendants are negligent by failing to develop a plan that is adequate to control, discourage, or eliminate nudity, by failing adequately to implement the plan that they did adopt, and by failing to consider the effect that nude recreation would have on plaintiffs' interests in their private property, thus breaching a nondiscretionary duty to plaintiffs under ORS 496.138. Those things allegedly harmed plaintiffs in the ways described in the original complaint.

■ Whether plaintiffs' amended complaint states a claim for a public or private nuisance is a closer issue than is their original complaint. It is less clear from the amended complaint that plaintiffs' land has been affected by sexual activity rather than simple nudity, and it now appears that defendants are in fact attempting to reduce the impact of public nudity on plaintiffs. As plaintiffs describe the plan, if implemented it will eliminate the effect of intrusive nudity on their land, thus ending any private nuisance. It will similarly end the special injury to plaintiffs from any public nuisance.

■ Plaintiffs' continuing claims must be based on their allegation that defendants are failing to implement the plan adequately. Under section 838 of the *Restatement*, they must also show that defendants' failure to implement the plan is

the result of their lack of reasonable care. A number of plaintiffs' concerns, such as embarrassment at coming in contact with public nudity or their fear for their safety because of their proximity to the nude beach, are things that they share in common with the public at large and thus cannot support a claim for a public nuisance. Those things are also not directly related to the use and enjoyment of plaintiffs' land and therefore do not support a claim for a private nuisance. Plaintiffs' reliance on ORS 496.138 to establish that defendants have a duty to them as property owners to prevent nudity and limit the use of the wildlife area to wildlife-related uses is unavailing. As we discuss below, the statute sets forth the general duty of the State Fish and Wildlife Commission to implement state policies for the management of wildlife. Nothing in the statement of the Commission's responsibilities creates any private rights. *Cf. Nearing v. Weaver*, 295 Or 702, 670 P2d 137 (1983) (statute expressly created duty to arrest person who violated restraining order and injured person therefore had right to recover for breach of that duty).

We conclude, despite these concerns, that the amended complaint states a claim for both a public and private nuisance, because its allegations could be read to include those things that we found sufficient in the original complaint and because it alleges that defendants have failed to implement the management plan. That conclusion means that plaintiffs are entitled to pursue their injunction claims. Whether they are entitled to pursue their claims for damages depends on whether defendants are immune under the OTCA.

The essence of plaintiffs' claim for damages is that defendants had a nondiscretionary duty to exercise their authority over the wildlife area to reduce or eliminate nudity and its effects. They base that assertion on ORS 496.138, which provides, in part:

"(1) Consistent with the policy of ORS 496.012, the State Fish and Wildlife Commission shall implement the policies of this state for the management of wildlife. These policies and programs shall consider the uses of public and private lands and utilize voluntary partnerships with private and public landowners to protect and enhance wildlife

habitat and effectively manage wildlife. In addition, the commission shall perform any other duty vested in it by law.

"(2)   In accordance with the applicable provisions of ORS 183.310 to 183.550, the commission shall adopt such rules and standards as it considers necessary and proper to implement the policy and objectives of ORS 496.012 and perform the functions vested by law in the commission."

The statute ties the commission's responsibilities to ORS 496.012, in which the legislature declared that the policy of the state is that "wildlife shall be managed to prevent serious depletion of any indigenous species *and* to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state." (Emphasis added.) It then established six coequal goals of wildlife management, including:

"(4)   To develop and maintain public access to the lands and waters of the state and the wildlife resources thereon.

"(5)   To regulate wildlife populations and the public enjoyment of wildlife in a manner that is compatible with primary uses of the lands and waters of the state.

"(6)   To provide optimal recreational benefits."

In *Pendergrass v. State of Oregon*, 74 Or App 209, 702 P2d 444, *rev den* 300 Or 162 (1985), we summarized the law of discretionary function immunity as it applies to a public agency's failure to adopt or consider adopting rules. We did so by explaining the Supreme Court's decision in *Miller v. Grants Pass Irrigation*, 297 Or 312, 686 P2d 324 (1984):

"The text of *Miller* suggests that a state agency's failure to adopt or consider a particular rule is immune *per se*, if the agency is the legislature's direct delegate and if the statute that authorizes it to adopt rules says that it 'may' do so rather than that it 'shall.' However, the quoted footnote in *Miller* says that it is clear that rulemaking is not always a discretionary exercise and that rulemaking is not discretionary when the rules entail only 'detailed specifications of a prescribed policy that an agency is mandated to issue without independent policy judgment.' "

*Pendergrass*, 74 Or App at 215. It is clear under the criteria that we described in *Pendergrass* that defendants' actions or inactions that plaintiffs challenge are immune. First, plaintiffs do not refer to any statute or other authority that would require or, indeed, allow defendant State Lands to adopt any rules with regard to nudity in the wildlife area. Second, defendant Fish and Wildlife does have authority to regulate nudity in the wildlife area. Plaintiffs point out that ORS 496.138 states that the Commission, which is the policy-making body for Fish and Wildlife, "shall" adopt rules in various respects. However, whether to adopt rules on the specific subject of nudity, and what those rules should provide, both necessarily require the exercise of independent policy judgment rather than simply providing the details of a specified policy.

ORS 496.138(1) provides that the Commission "shall implement the policies and programs of this state for the management of wildlife," and ORS 496.138(2) provides that it "shall adopt such rules and standards as it considers necessary and proper to implement the policy and objectives of ORS 496.012[.]" Those statutes require the Commission to adopt rules of some sort on some subject, but they give the Commission discretion in deciding what subjects to cover and what rules to adopt. That is particularly true in light of the statement of purpose in ORS 496.012, which includes public access to the lands of the state as well as to its wildlife resources and which, in subsection 6, expressly states that one of the objectives of wildlife management is to "provide optimum recreational benefits." The Commission, thus, has discretion about whether to regulate nude recreation in the wildlife area and, if so, how to regulate it. That is the essence of discretionary immunity under ORS 30.265(3)(c).

This is not a circumstance in which Fish and Wildlife has a nondiscretionary duty to act to prevent harm. Its actions did not create any nuisance.[6] It does not have a duty

---

[6] In this respect, the situation is the opposite of that in *Wilson v. City of Portland*, 153 Or 679, 58 P2d 257 (1936), and *Ulmen v. Town of Mt. Angel*, 57 Or 547, 112 P 529 (1911), which the dissent cites. In each of those cases, the municipality actively created the condition that constituted a nuisance. In addition, they involved the liability of a municipality, not of a state agency such as defendants. Before the adoption of the Tort Claims Act, a municipality, when not acting in a

to adopt rules that simply fill in the details of a legislatively created policy; rather, its delegated authority is, in large part, to make policy. *See Miller*, 297 Or at 317-18. Nor does Fish and Wildlife have a particular relationship to plaintiffs that creates a duty to take *some* action to protect them, such as that between a school district and a student. *See, e.g. Mosley v. Portland School Dist. No. 1J*, 315 Or 85, 92, 843 P2d 415 (1992); *Fazzolari v. Portland School District No. 1J*, 303 Or 1, 22 n 20, 734 P2d 1326 (1987) (while a public body has wide discretion in choosing the means to carry out its duty to someone to whom it owes a particular duty of care, it does not have the discretion to do nothing). Finally, Fish and Wildlife did not *create* the nuisance, which would require it to take steps to eliminate it. Although the nuisance, if any, exists on land that it controls, the nuisance is the result of the independent actions of third parties, not of Fish and Wildlife. Even if Fish and Wildlife had created the nuisance, it would have discretion in deciding what steps to mitigate the effects of its actions and would be immune from liability for money damages if those steps were not fully effective. *Penland v. Redwood Sanitary Sewer Service Dist.*, 146 Or App 225, 235-36, 934 P2d 434 (1997), *rev'd on other grounds* 327 Or 1, 956 P2d 964 (1998).[7] The mere existence of a common-law nuisance may be sufficient to support an injunction, because that does not involve a claim for monetary damages, but it does not in itself overcome discretionary immunity from such damages.[8]

---

governmental capacity, was subject to the same liability as a private party. The statement in *Wilson* that the dissent cites, thus, has no relevance to the liability of a state agency. *See Wilson*,153 Or at 685-86; *Wheeler v. City of St. Helens*, 153 Or 610, 617, 58 P2d 501 (1936). *See also Penland,* below, 146 Or App at 232-33 (pre-Tort Claims Act cases concerning municipality's liability for creating a nuisance do not affect municipality's discretionary function immunity under the Act). In the same way, a school district, which apparently was seen as more of a state agency than was a municipality, was liable only for actions taken in its corporate capacity, not when it fulfilled governmental functions. *See Antin v. Union High School Dist. No. 2*, 130 Or 461, 464-67, 280 P 664 (1929). In any case, it was clear that, if payment would come directly from the state treasury, a state agency was absolutely immune from a claim for damages in the absence of a statute waiving immunity. *See Schrader v. Veatch et al*, 216 Or 105, 108-09, 337 P2d 814 (1959); *Bennett v. State Ind. Acc. Comm.*, 203 Or 275, 277-78, 279 P2d 655, 279 P2d 886 (1955).

[7] In its decision in *Penland*, the Supreme Court held that discretionary immunity does not apply to actions for equitable rather than monetary relief. Because of that conclusion, it did not need to consider the grounds on which we held that the defendant's actions were immune.

[8] As the Supreme Court commented in *Miller*, we must avoid interpreting the discretionary function exception in a way that would "swallow up the concept of

There is, thus, no basis for holding that Fish and Wildlife's alleged inaction before it adopted the policy described in the amended complaint violated any nondiscretionary duty to act. The trial court correctly dismissed plaintiffs' nuisance claims to the extent that they sought monetary damages rather than injunctive relief.

■      Plaintiffs next assign error to the trial court's grant of defendants' motion to dismiss their claims in the original complaint for inverse condemnation. The foundation of those claims is that the nudity has interfered with plaintiffs' use of their property, thereby substantially reducing its value. Plaintiffs rely on *Thornburg v. Port of Portland*, 233 Or 178, 376 P2d 100 (1962), in which the Supreme Court held that noise that resulted from the landing and take-off patterns at the Portland airport could create a nuisance that constituted a taking of the plaintiffs' land. The plaintiffs alleged that the noise was so great as to make their land unusable. 233 Or at 181. The court noted that a taking under Article I, section 18, of the Oregon Constitution, is any destruction, restriction, or interruption of the common and necessary use and enjoyment of the property. *Id.* at 185.

> "[T]he only 'property' right of the possessor of land which has any value is his ability to use and enjoy his land. * * * If the government substantially deprives the owner of the use of his land, such deprivation is a taking for which the government must pay. * * * If, on the other hand, the government merely commits some tort which does not deprive the owner of the use of his land, then there is no taking." *Id.* at 189.

The issue in each case is whether, as a matter of fact, the governmental activity has resulted "in so substantial an interference with use and enjoyment of one's land as to amount to a taking of private property for public use." The court stated that a taking would require that a nuisance be "so aggravated as to amount to a complete ouster or deprivation of the beneficial use of property[.]" *Id.* at 190.

In a subsequent decision in the same case, the Supreme Court stated that there is a compensable invasion

---

discretion by holding a public body liable whenever it is found not to have actually satisfied its tort duty." 297 Or at 320. That, however, is precisely what the dissent would do.

of an individual's property rights in a nuisance case when the interference with the use and enjoyment of the land is "sufficiently direct, sufficiently peculiar, and of sufficient magnitude to support a conclusion that the . interference has reduced the fair market value of the plaintiff's land by a sum certain in money." *Thornburg v. Port of Portland*, 244 Or 69, 73, 415 P2d 750 (1966). That statement may suggest that a nuisance that simply reduces the value of the property can constitute a taking. Such a reading, however, would be inconsistent both with the original decision in *Thornburg* and with later Supreme Court inverse condemnation cases, which emphasize that a taking requires the deprivation of all feasible private uses of the property or of some specific right in the property and that the Oregon Constitution does not treat damage to property as a taking requiring just compensation. *See, e.g., Hawkins v. City of La Grande*, 315 Or 57, 68, 843 P2d 400 (1992); *Suess Builders v. City of Beaverton*, 294 Or 254, 261, 656 P2d 306 (1982); *Fifth Avenue Corp. v. Washington County*, 282 Or 591, 614, 581 P2d 50 (1978). In the first *Thornburg* case, the Supreme Court stated that there could be a taking if the nuisance substantially deprived the owner of the use of the land, a test that is consistent with the court's later opinions. The importance of the *Thornburg* cases is that they permit a plaintiff to base a claim for inverse condemnation on a nontrespassory nuisance, not that they create a standard for determining what is a taking that applies only to a nuisance.

It is patent from plaintiffs' allegations that the nudity has not deprived them of all feasible private uses of the property. Unlike the plaintiffs in *Thornburg*, they do not allege that the nudity has made their land unusable. Rather, they allege that they have lived on their property since 1990; their complaints about the difficulty of having friends and family visit them would be meaningless without such an allegation. Although plaintiffs allege that the nudity has affected the value of their property, they do not assert that the property has become valueless. Because they are currently using the property for a residence, they are necessarily receiving some economic benefit from it; the property must, therefore,

have some value. The trial court correctly dismissed their claims for inverse condemnation.[9]

Reversed and remanded on claims for injunctive relief for private and public nuisance; otherwise affirmed.

**EDMONDS, J.,** dissenting.

The majority holds that plaintiffs have properly pled a claim for nuisance against the defendant agencies but that the agencies are immune from liability for damages under ORS 30.265(3)(c). In the majority's words, Fish and Wildlife's "actions did not create any nuisance[,]" nor did Fish and Wildlife "have a particular relationship to plaintiffs that create[d] a duty to take *some* action to protect them." 158 Or App at 367-68 (emphasis in original). It concludes:

"Even if Fish and Wildlife had created the nuisance, it would have discretion in deciding what steps to mitigate the effects of its actions and would be immune from liability for money damages if those steps were not fully effective. The mere existence of a common-law nuisance may be sufficient to support an injunction, because that does not involve a claim for monetary damages, but it does not in itself overcome discretionary immunity from such damages." 158 Or App at 368 (footnotes omitted; citation omitted).

I disagree with the majority's conclusion that ORS 30.265(3)(c) does not permit a damage claim for nuisance under the circumstances alleged in this case. According to plaintiffs' pleadings, the agencies are liable for a nuisance by permitting activities that unreasonably and substantially interfere with plaintiffs' use and enjoyment of their property on the government lands under their control. The majority's assertion that the defendant agencies have no duty to take action to protect plaintiffs proves too much.[1]

---

[9] Plaintiffs pled an inverse condemnation claim under both the federal and state constitutions. However, on appeal they do not assert that the result under the federal constitution would be different from that under the state, nor do they significantly rely on federal authority. We therefore do not consider their federal claim.

[1] Under the common law, governmental bodies like cities had "no more right than an individual to create and maintain a nuisance on its own property; and if it [did] so it [was] subject to the same liability as an individual." *Wilson v. City of Portland*, 153 Or 679, 685, 58 P2d 257 (1936). *See also Ulmen v. Town of Mt. Angel,*

Defendants are agencies of the State of Oregon that derive their authority and their exposure to liability from statutes. ORS 30.320 provides that an action may be maintained against the State of Oregon in the name of the appropriate state agency for liability in tort as provided in ORS 30.260 to 30.300.[2] ORS 30.260 *et seq.* does not prohibit nuisance claims and expressly permits, under certain circumstances, claims for damages based on common-law tort theories. When those circumstances exist, the tort liability of an agency is no different from that of a private landowner under the common law. At common law, a civil division of a state that "in the exercise of its corporate powers, * * * create[d] or permit[ted] a nuisance by misfeasance or nonfeasance * * * [could be] liable in damages to any person suffering special injury therefrom" in the absence of a statute immunizing them from liability. *Antin v. Union High School Dist. No. 2,* 130 Or 461, 464-65, 280 P 664 (1929).[3] The import of that observation is not to suggest that the legislature in enacting ORS 30.265 intended to adopt the common-law criteria for public body liability for a nuisance but to emphasize that the concept of such liability is not an unprecedented notion. To the extent that ORS 30.265 waives the sovereign immunity of the State of Oregon for liability for common-law torts, the agencies are liable for damages resulting from any nuisance that they have permitted to affect plaintiffs' property.

ORS 30.265 provides, in part:

"(1)   Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function or while operating a motor vehicle in a ridesharing arrangement authorized under ORS 276.598. * * *

---

57 Or 547, 551, 112 P 529 (1911) (holding that a municipal body is liable if it collects surface water and empties the water on the land of an adjoining landowner).

  [2] ORS 30.260(4)(a) defines a "public body" against whom a tort action can be maintained as "[t]he state and any department, *agency,* board or commission of the state." (Emphasis added.)

  [3] Under Article IV, section 24, of the Oregon Constitution, the doctrine of sovereign immunity exists as to the liability of state agencies, except as authorized by the legislature. *Vendrell v. School District No. 26C et al,* 226 Or 263, 278, 360 P2d 282 (1961).

"* * * * *

"(3)   Every public body and its officers, employees and agents acting within the scope of their employment or duties * * * are immune from liability for:

"* * * * *

"(c)   Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."[4]

The inaction of a public body to prevent harm is not always immune from liability under ORS 30.265(3)(c). For instance, in *Miller v. Grants Pass Irrigation*, 297 Or 312, 686 P2d 324 (1984), the issue was whether an irrigation district's failure to install a warning device for boaters regarding its dam on the Rogue River involved a discretionary function under the statute. The court indicated:

"If there is a legal duty to protect the public by warning of a danger or by taking prevent[ative] measures, or both, the choice of means may be discretionary, but the decision whether or not to do so at all is, by definition, not discretionary." *Id.* at 320.

It concluded:

"Because ORS 30.265(3)(c) provides immunity for failure to exercise a discretionary function or duty but not for failure to undertake a nondiscretionary function or duty, it follows that the district would not be immune for wholly disregarding and declining to consider whatever duty it had under tort law." *Id.* at 321.

Similarly, the court held in *Stevenson v. State of Oregon*, 290 Or 3, 619 P2d 247 (1980), that the failure to exercise discre-

---

[4] In *Penland v. Redwood Sanitary Sewer Service Dist.*, 327 Or 1, 956 P2d 964 (1998), the plaintiff property owners sought to enjoin the defendant District from composting sewage material at a neighboring sewage treatment plant on the ground that the activity created a nuisance. The District argued that its activity was immune under ORS 30.265(3)(c). The court held that the statute did not confer immunity from injunctive relief. Whether the plaintiff could have succeeded in a claim for damages based on nuisance was not before the court.

tion to install adequate shields on traffic signals, so thatmotorists would not be misled regarding the governing signal, is not the kind of act that is an immune function within the meaning of the statute as a matter of law.

In my view, the duty of a state agency to exercise discretion to prevent harm to adjoining lands from activities on land under its control is nondiscretionary under the statute. It is like the duty of a public body to exercise discretion to prevent harm from a known dangerous condition such as the existence of a dam on a river typically used by boaters or the duty to exercise discretion to maintain traffic signals so that motorists will not be misled and injured when they use a public intersection. ORS 30.265(3)(c) affords no immunity from damages in this case for the same reason that it afforded no immunity in *Stevenson* and resulted in the reversal of summary judgment on the ground of immunity in *Miller*. Although the agencies have discretion about how to regulate the activities on their lands so as to prevent a nuisance, they do not have discretion to disregard and to decline to consider their duty to regulate in the face of obvious harm. The latter is the gravamen of plaintiffs' pleadings.

The majority complains that to interpret the discretionary exception in the above manner would, in the words of the *Miller* court, " 'swallow up the concept of discretion.' " 158 Or App at 368 n 8 (quoting *Miller*, 297 Or at 320). Of course, the court in *Miller* held that in the event of the existence of a duty to warn of the danger or to prevent harm, the district's failure to decide whether to exercise its discretion would not constitute *the exercise* of a discretionary function. As the court in *Miller* noted, the other extreme is to interpret the statute to permit the public body to ignore its duty by simply failing to exercise its discretion, and the legislature could not have intended that result. It belies common sense to believe that the legislature would have intended that state agencies permit nuisances originating on lands under their control to interfere with the use and enjoyment of adjoining properties without exercising their discretion to regulate the activities causing the nuisance. Plaintiffs' allegations fall within the rule of law expressed in *Miller* and *Stevenson* that a public

body cannot be immune under the statute by refusing to exercise its discretion in the face of a common-law duty to prevent harm.

For these reasons, I dissent.